**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

AUDRAY LOHN,                }
                               }
        *Plaintiff,*        }
v.                          }     Civil Action No. H-06-3690
                               }
MORGAN STANLEY DW, INC.,    }
                               }
        *Defendant.*       }

**OPINION AND ORDER**

       Presently before the Court is Defendant Morgan Stanley DW, Inc.'s (Morgan Stanley) motion for summary judgment (Doc. 52). Upon review and consideration of the motion, the response, reply, and surreply thereto, and the relevant legal authority the Court finds that the motion should be granted-in-part and denied-in-part.

I.         <u>Background and Relevant Facts</u>

       Plaintiff Audray Lohn (Lohn) initiated suit against Defendant Morgan Stanley in the 269th District Court of Harris County, Texas (Cause No. 2006-68364) asserting gender discrimination and retaliation claims under the Texas Commission on Human Rights Act (TCHRA). Defendant subsequently removed the case to this Court on diversity jurisdiction grounds (Doc. 1).

       Morgan Stanley hired Lohn as a Financial Advisor in 1993.  (Lohn Dep., Doc. 69 Ex. B at 24-25).  Through its Financial Advisors at each branch, Morgan Stanley provides clients with "comprehensive financial planning services, customized to meet individual investment goals and risk profiles." (Kabot Aff., Doc. 52 Ex. 1 at ¶ 4).  Lohn attended training in New York for a month and was then assigned to the Greenway Plaza Branch in Houston, Texas, where she

remained until her termination in 2005. (*Id.* at 25-27). Lohn had four Branch Managers over the course of her twelve years at Morgan Stanley. They are as follows: (1) Don Harris (Harris), 1993 to 1996; (2) Matt Kabot (Kabot), 1996 to 2000; (3) Mark Benson (Benson), 2000 to 2002; and (4) Pete Sigal (Sigal), 2002 to 2005. (Lohn Aff., Doc. 69 Ex. A at ¶ 3).

The treatment and conduct about which Plaintiff complains may be divided into three distinct categories. They are as follows: (1) the discriminatory distribution of client accounts, (2) the sexual harassment that female employees, including Lohn, endured which, in turn, led to a hostile work environment, and (3) the August 2005 reduction-in-force. The Court will summarize the relevant facts pertaining to each of these categories below.

A.     Discriminatory Distribution of Client Accounts

When a Financial Advisor leaves Morgan Stanley or leaves his position for a non-producing management or administrative position, that Financial Advisor's client accounts are "typically divided and reassigned to the remaining [Financial Advisors] in the branch." (Kabot Aff., Doc. 52 Ex. 1 at ¶ 11). The Financial Advisors who receive these accounts then contact the account holders in an effort to encourage them to remain with Morgan Stanley. (*Id.*).

Prior to November 12, 2002, it appears that there was no formal procedure or policy in place with respect to the distribution of accounts. It was not until this date that Morgan Stanley implemented a Power Ranking System "to standardize the process by which accounts of Financial Advisors who leave the firm are reassigned to other [Financial Advisors]." (Doc. 69 Ex. G at 1). The Financial Advisor Power Ranking spreadsheet employs a fixed set of weighted criteria to generate a Financial Advisor ranking for each branch, and the Business Intelligence System Client Retention report ranks each Financial Advisor's client households by total assets. (*Id.*). The Financial Advisor Power Ranking methodology incorporates these factors: (1) asset

growth, (2) asset-based revenues as a percentage of trailing 12 month production, (3) trailing 12 month production, (4) total assets, (5) trailing 12 month new accounts, (6) length of service as a Financial Advisor with Morgan Stanley, and (7) industry professional designations.  (*Id.* at 2). After ranking the Financial Advisors and the client households, the Branch Manager either matches the top-ranked Financial Advisor with the top-ranked account and proceeds accordingly or invites each Financial Advisor by rank to select an account from the Client Retention Report ranking.  (*Id.* at 3).   The Branch Manager may, in the exercise of his or her management discretion, distribute an account outside of this process.  (*Id.*).  Permissible exceptions include: the client requested the Financial Advisor or has a prior existing relationship with the Financial Advisor, the client requested the Financial Advisor's particular skill set or expertise, the Financial Advisor possesses the license or registration requirement to service the account, and the Financial Advisor to which the account was originally assigned in the distribution process failed to contact the client.  (*Id.*).  Any such distributions must be documented in an Exceptions Report.  (*Id.*).   The November 12, 2002, memorandum also describes the procedures for documenting and maintaining records on all account distributions (*Id.*).[1]

When Lohn received accounts as a result of a distribution, the accounts were typically small, low revenue, or problematic.  (Lohn Aff., Doc. 69 Ex. A at ¶ 6).  In the twelve years that she worked for Morgan Stanley, she never received an entire book of business.  (*Id.*). When Kabot served as Branch Manager, Lohn was supposed to receive a portion of Bill Stern's (Stern) book but never did.  (*Id.* at ¶ 10).  Additionally, when Jill Harris left in August 2002, she

---

[1] The September 12, 2003, memorandum describes the revised Account Distribution Procedures.  (Doc. 69 Ex. H).  Morgan Stanley implemented these changes to further standardize the process by which accounts of Financial Advisors who leave the firm are reassigned to other Financial Advisors.  (*Id.* at 1).  The factors in the Power Ranking methodology include: (1) year-to-date production summary, (2) total assets, (3) year-to-date net new assets, (4) asset-based revenue as a percentage of overall year-to-date production summary, (5) trailing 12 month new accounts, and (6) length of experience as a Financial Advisor.  (*Id.* at 2).

requested that "her accounts" be given to Lohn.  (*Id.* at ¶ 13).  Lohn, however, only received "a few small accounts" from this distribution.  (*Id.*).  Furthermore, Lohn did not receive any accounts from the following individuals who departed between 2002 and 2005: Bill Alkek, David Beverly (Beverly), Christopher Carroll, Clifton Facey, Jay Fain, Brandon Fox, Jeff Green, Stacy Jata, Herbert Lyman, and Stephen Vance.  (*Id.* at ¶ 14).  Moreover, she never received any accounts from any of the trainees who left during those three years.  (*Id.*).

Additionally, Plaintiff cites to two occasions where an entire book of business was distributed to a male Financial Advisor without the Branch Manager applying the Power Ranking System.  Karla Robinson (Robinson) departed Morgan Stanley in 2003, and her entire book of business was distributed to Tom Chretien.  (Greer Aff., Doc. 75 Ex. U at ¶ 13-15; Doc. 75 Ex. U-7).  Beverly left Morgan Stanley's employ in November 2004, and all of his accounts were distributed to David Aigner.  (Greer Aff., Doc. 75 Ex. U at ¶ 10-12; Doc. 75 Ex. U-6).  There is no documentation that Morgan Stanley made these distributions pursuant to the Power Ranking System.

B.  <u>Sexual Harassment and Hostile Work Environment</u>

Over the course of her twelve years of employment with Morgan Stanley, Lohn alleges that she was subjected to humiliating and harassing treatment because she was a woman. (Lohn Aff., Doc. 69 Ex. A at ¶ 17).  She claims that this treatment was ongoing over the course of her tenure regardless of who her Branch Manager was or whether the Branch Manager joined in with her fellow coworkers.  (*Id.*).

Early in Lohn's career at Morgan Stanley, her Branch Managers and male coworkers referred to her as the TFB, which stands for "Token Female Broker," and had an office betting pool on how long she would last.  (*Id.* at ¶ 18).  When Lohn returned from her

initial one-month training in New York in 1993, she was assigned an office directly facing the lobby, and anyone who came into the branch office had a direct view of her.  (*Id.* at ¶ 19).  Lohn complained to Harris, her Branch Manager at the time, that this location was disruptive to her work.  (*Id.*).  In response, he informed her that she was the FOP, which stands for "Front Office Personality," implying that she was merely a pretty face and not a respected broker.  (*Id.*).

When Kabot served as Branch Manager from 1996 to 2000, the humiliating and harassing conduct continued.  (*Id.* at ¶ 21).  Kabot would constantly stare at Lohn's breasts and do whatever he could to brush up against her.  (*Id.*).  For example, he would walk into her in the hallway or rub up against her back when she stopped walking.  (*Id.*).  Moreover, when Kabot asked Lohn how she was doing and she responded "fine," he would reply "I know you are fine" in a sexually provocative manner.  (*Id.*).  During Kabot's tenure as Branch Manager, Lohn asked him if she could participate in an IPO investment, but he refused.  (*Id.* at ¶ 22).  When asked why, Kabot said, "[b]ecause you should just go home and have babies."[2]  (*Id.*).  Around the same time, one of Lohn's male coworkers, Doug Hall, said, "Do you know what you need?  You need a 200-pound broker between your legs."  (*Id.* at ¶ 23).

Although Lohn does not cite to specific instances of humiliating or harassing conduct by Benson, the Branch Manager from 2000 to 2002, she does complain about Don Whitehead (Whitehead), who transferred into the office in 2002.  Other than these allegations about Whitehead and Lohn's statements that "the harassing and derogatory comments occurred often" and that she "consistently received sexually inappropriate messages," there is no evidence of inappropriate conduct during Benson's tenure.  (*Id.* at ¶¶ 24, 28, & 29).  Whitehead constantly referred to his penis in front of Lohn, as well as others.  (*Id.*).  In 2003, Whitehead circulated around the office a sexually provocative picture of a female intern that he had taken at his home.

---

[2] Lohn was particularly upset by this comment because she cannot, in fact, have children.  (*Id.*).

(*Id.* at ¶ 25).   During a meeting in 2004, Whitehead said that he had set up video cameras in his bedroom in order to record his sexual activity.   (*Id.* at ¶ 26).   Both Whitehead and Chris Geston (Geston), another male broker, would frequently comment about strip clubs and strippers.   (*Id.* at ¶ 27).   Geston would imitate gyrating stripper movements in front of the sales personnel, and Lohn found this offensive.   (*Id.*).   On May 9, 2005, a sexually explicit cartoon was left in Lohn's inbox.   (*Id.* at ¶ 28; Doc. 69 Ex. A-3).   Lohn consistently received sexually inappropriate messages in her inbox and email.   (*Id.* at ¶ 28).

Lohn complained about the aforementioned inappropriate behavior, but the situation never improved.   (*Id.* at ¶ 30).   Another woman in Lohn's office had similar experiences.   Whitehead allegedly made several inappropriate comments to Sharon Abbey (Abbey) including that she needed "to get laid."   (Abbey Dep., Doc. 69 Ex. C at 64).   When he needed to use the restroom, Whitehead would say he was going to "release the dragon."   (*Id.* at 71).   He asked Abbey whether she would go home with a man the first night she met him at a bar.   (*Id.* at 77).   In another conversation, Whitehead insinuated that Abbey's 22-year-old daughter was at his apartment the night before.   (*Id.* at 64-65).   He claimed he had mirrors above his bed to help videotape his sexual activity, and he told her to pull the string on the tea bag the way she would pull a string on her tampon.   (*Id.* at 66, 146-47).

Lohn filed a complaint about Harris with the human resources department at Morgan Stanley during the mid-1990s.   (Lohn Dep., Doc. 69 Ex. B at 70-73).   Additionally, Lohn had numerous conversations with Sigal during his tenure as Branch Manager regarding the sexually inappropriate behavior at the office.   (Lohn Aff., Doc. 69 Ex. A at ¶ 30).   Sigal's reply to Lohn's complaint was often that she was "killing him" or that things would be different.   (*Id.*).

C.    August 2005 Reduction-in-Force

On July 29, 2005, Rick Sanchez (Sanchez) sent a memorandum to the Regional Directors advising them of the "Underperforming [Financial Advisor] Reduction."  (Doc. 69 Ex. L).  All Regional Directors would receive a list of, *inter alia*, all Financial Advisors registered and in production for eight or more years with annualized total revenue (as of May) of $225,000 or less.  (*Id.*).  Sanchez believed and wanted to work with the Regional Directors to confirm that the identified individuals have "failed dramatically to meet acceptable production expectations relative to their respective peer groups."  (*Id.*).  Additional consideration would, however, be given to the selection of those individuals who had not been in production for the full 2005 fiscal year or any individual who is a member of higher producing teams such that the revenue attributed to his or her individual production number is not representative of his or her actual contribution.  (*Id.*).  If the identified employees' situations did not warrant additional consideration, there would be a presumption in favor of release as to any of the employees identified and, as such, the Regional Directors would be required to defend "on fair, legitimate, objective and quantifiable grounds" any requested termination exceptions.  (*Id.*).

Vanessa Henley, a Senior Generalist in Human Resources at the time of the August 2005 Reduction-in-Force,  worked with management to identify the individuals that would ultimately be terminated.  (Henley Aff., Doc. 52 Ex. 4 at ¶ 6).  In Branch 372, there were four Financial Advisors who failed to meet Morgan Stanley's production expectations relative to their peers and, as such, were terminated.  These individuals include: (1) Amy Guidroz with an annualized 2005 fiscal year production of $37,554; (2) Lohn with an annualized 2005 fiscal year production of $167,520; (3) John Nabergall with an annualized 2005 fiscal year production of $202,625; and (4) George Russell, Jr. with an annualized 2005 fiscal year production of $39,601.

(*Id.* at ¶ 8).  There were four other individuals at Lohn's branch who were initially selected for the Reduction-in-Force but were not terminated.  They are as follows: (1) James Douglas Hall with an annualized 2005 fiscal year production of $196,715 had been on approved medical leave; (2) Carl Wolford with an annualized 2005 fiscal year production of $181,232 was the Financial Advisor in charge of the Beaumont office of convenience; (3) Karen Buchanan with an annualized 2005 fiscal year production of $1,706 was a team member with other Financial Advisors; and (4) Vicky Thomas with an annualized 2005 fiscal year production of $1 was a team member with other Financial Advisors.  Other than these eight individuals, the remaining Financial Advisors at Lohn's branch met Morgan Stanley's production expectations as set forth in Sanchez's memorandum.

II.       Legal Standards

         A.       Summary Judgment

         A party moving for summary judgment must inform the court of the basis for the motion and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003).  The substantive law governing the suit identifies the essential elements of the claims at issue and, therefore, indicates which facts are material.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The initial burden falls on the movant to identify areas essential to the nonmovant's claim in which there is an "absence of a genuine issue of material fact."  *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005).  If the moving party

fails to meet its initial burden, the motion must be denied, regardless of the adequacy of any response. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

Once the movant meets its burden, however, the nonmovant must direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 323-24.   The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indust. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citing *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).  Instead, the non-moving party must produce evidence upon which a jury could reasonably base a verdict in its favor. *Anderson*, 477 U.S. at 248; *see also DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005).   To do so, the nonmovant must "go beyond the pleadings and by [its] own affidavits or by depositions, answers to interrogatories and admissions on file, designate specific facts that show there is a genuine issue for trial." *Webb v. Cardiothoracic Surgery Assoc. of North Texas, P.A.*, 139 F.3d 532, 536 (5th Cir. 1998). Unsubstantiated and subjective beliefs and conclusory allegations and opinions of fact are not competent summary judgment evidence.  *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998); *Grimes v. Texas Dept. of Mental Health and Mental Retardation*, 102 F.3d 137, 139-40 (5th Cir. 1996); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994), *cert. denied*, 513 U.S. 871 (1994); *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992), *cert. denied*, 506 U.S. 825 (1992).  Nor are pleadings summary judgment evidence. *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1046 (5th Cir. 1996) (citing *Little*, 37 F.3d at 1075).  The non-movant cannot discharge his burden by offering vague allegations and legal conclusions. *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992); *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 889 (1990).  Nor is the court required by Rule 56 to sift through the record in search of evidence

to support a party's opposition to summary judgment. *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Skotak v. Tenneco Resins*, Inc., 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992)).

Nevertheless, all reasonable inferences must be drawn in favor of the non-moving party. *Matsushita*, 475 U.S. at 587-88; *see also Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003). Furthermore, the party opposing a motion for summary judgment does not need to present additional evidence, but may identify genuine issues of fact extant in the summary judgment evidence produced by the moving party. *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 198-200 (5th Cir. 1988). The non-moving party may also identify evidentiary documents already in the record that establish specific facts showing the existence of a genuine issue. *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990). In reviewing evidence favorable to the party opposing a motion for summary judgment, a court should be more lenient in allowing evidence that is admissible, though it may not be in admissible form. *See Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.,* 831 F.2d 77, 80 (5th Cir. 1988).

B.     The TCHRA

Plaintiff in the instant case alleges two causes of action under the TCHRA, one for gender discrimination and another for retaliation. The TCHRA provides that an employer commits an unlawful employment practice if, because of the employee's sex, the employer:

> (1) fails or refuses to hire an individual, discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment; or

> (2) limits, segregates, or classifies an employee or applicant for employment in a manner that would deprive or tend to deprive an

individual of any employment opportunity or adversely affect in
any other manner the status of an employee.

TEX. LAB. CODE ANN. § 21.051.  In addition, the TCHRA provides that an employer commits an

unlawful employment practice if it retaliates or discriminates against a person who:

(1) opposes a discriminatory practice;

(2) makes or files a charge;

(3) files a complaint; or

(4) testifies, assists, or participates in any manner in an
investigation, proceeding, or hearing.

TEX. LAB. CODE ANN. § 21.055.

"The legislature drafted the TCHRA to 'correlat[e] state law with federal law in

the area of discrimination in employment.'"  *Martin v. Kroger Co.*, 65 F. Supp. 2d 516, 530

(citing *Gold v. Exxon Corp.*, 960 S.W. 2d 378, 380 (Tex. App.—Houston [14th Dist.] 1998, no

pet.) (quoting *Schroeder v. Texas Iron Works, Inc.*, 813 S.W.2d 483, 485 (Tex. 1991)).  The

TCHRA specifically states that one of its purposes is to "provide for the execution of the policies

of Title VII of the Civil Rights Act of 1964 and its subsequent amendments (42 U.S.C. Section

2000e *et seq.*)."  *Id.* at 530 (quoting TEX. LAB. CODE ANN. § 21.001).  Accordingly, the TCHRA

is interpreted in a manner consistent with federal laws that prohibit employment discrimination.

*Id.* (citing *Specialty Retailers, Inc. v. DeMoranville*, 933 S.W.2d 490, 492 (Tex. 1996)).  The

analysis of a plaintiff's claims under the TCHRA is identical to that applied to claims brought

under Title VII.  *Id.* (citing *Colbert v. Georgia-Pacific Corp.*, 995 F. Supp. 697, 700 (N.D. Tex.

1998)).  "Because the TCHRA is the state counterpart to Title VII, the same standards apply."

*Id.* (quoting *Allison v. City of Fort Worth*, 60 F. Supp. 2d 589, 593 (N.D. Tex. 1999) (citing

*Farrington v. Sysco Food Servs., Inc.*, 865 S.W. 2d 247, 251 (Tex. App.—Houston [1st Dist.] 1993, writ denied); *Schroeder*, 813 S.W.2d at 485)).

III.      Evidentiary Issues

      A.      Objections to Summary Judgment Evidence

      Before addressing Plaintiff's claims of discrimination and retaliation, the Court will rule on the various objections to the affidavit and exhibits attached to Plaintiff's response to Defendant's motion for summary judgment.

      Federal Rule of Civil Procedure 56(e) states, in pertinent part,

> A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit. The court may permit an affidavit to be supplemented or opposed by depositions, answers to interrogatories, or additional affidavits.

Fed. R. Civ. P. 56(e).  In the Fifth Circuit, it is well settled that "the admissibility of summary judgment evidence is subject to the same rules of admissibility applicable to a trial."  *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 285 (5th Cir. 2004) (quoting *Resolution Trust Corp. v. Starkey*, 41 F.3d 1018, 1024 (5th Cir. 1995)).

      1.      Objections to Lohn's Affidavit

      Defendant objects to paragraphs 7, 8, 9, 10, 11, 12, 13, and 14 on the ground that Lohn has no personal knowledge upon which to base her statements.  Fed. R. Civ. P. 56(e) requires that opposing affidavits "be made on personal knowledge" and that they "show that the affiant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(e)(1).  A district court may rely upon affidavits in the summary judgment context where the affiants' "personal knowledge and competence to testify are reasonably inferred from their positions and the nature

- 12 -

of their participation in the matters to which they swore." *DIRECTTV, Inc. v. Budden*, 420 F.3d 521, 530 (5th Cir. 2005) (quoting *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990)).  For the reasons set forth below, the Court finds that these objections should be sustained-in-part and overruled-in-part.

With respect to paragraph 7, Lohn does not have any foundation or personal knowledge upon which to base her statement that these ten male brokers received the "best accounts."  As she testified in her deposition, "[i]t was just common knowledge at the company that these guys were just – were fed by [Harris]" and that she "never actually saw the account sizes or values or what the revenue was or the names."  (Lohn Dep., Doc. 52 Ex. 2 at 141-43).  Therefore, Defendant's objection to the contents of paragraph 7, with the exception of the statement that, "[Harris] was a producing manager, which meant that he handled accounts as well," is sustained.

The Court reaches a similar result with respect to paragraph 8, which provides examples of "entire books of business that were given or sold exclusively to male brokers" under Harris' management.  As her deposition testimony indicates, Lohn had no personal knowledge upon which to base this statement.  Her statements were purely speculative and based on hearsay and rumors.  (*Id.* at 167-73).  Therefore, the Court sustains this objection.

Paragraph 9 states that sixteen male brokers were able to get the "best accounts" when Kabot was Branch Manager.  Lohn based her statement that Kabot was giving his friends lucrative accounts on conversations that she overheard about the accounts and the fact that they were lucrative.  (*Id.* at 101).  Accordingly, the Court finds that this statement is not within her personal knowledge and is based on hearsay and speculation.  The objection is sustained.

Paragraph 10 provides examples of books of business given or sold exclusively to male brokers and follows with the statement that, "[i]nitially, I [Lohn] was supposed to receive a portion of Stern's book.  It was later decided that the book should go to Mark Furgoni and Charlie Hubert."  This statement is within the realm of Lohn's personal knowledge as it is based on a conversation she had with Stern.  (*Id.* at 159-60).  As such, the Court will overrule Defendant's objection to this portion of paragraph 10.  However, the Court will sustain Defendant's objection to the remainder of this paragraph as it is not within Lohn's personal knowledge as demonstrated by her deposition testimony.  (*Id.*).

Paragraph 11 states that when Benson was Branch Manager he gave the "best accounts" to sixteen male brokers, and paragraph 12 provides that Jay Jones' entire book of business worth approximately $30 million was given or sold to Don Whitehead.  Although Lohn worked in the branch with these individuals, there is no evidence in either her affidavit or her deposition testimony that she had personal knowledge of this information.  As far as the Court can tell, these statements are speculative and based on hearsay evidence and, as such, the Court shall sustain Defendant's objection.

Paragraph 13 states that the "best accounts" went to a list of twenty-two male brokers, and that when Jill Harris left in August 2002, she requested that "her accounts" be given to Lohn.  Lohn admits that she received "a few small accounts" but that the more lucrative accounts were given to others.  The statements that Jill Harris requested that her accounts be given to Lohn and that Lohn received a few small accounts are based on Lohn's personal knowledge, and, as such Defendant's objection to that portion of paragraph 13 is overruled.  The remainder of paragraph 13, however, is not based on Lohn's personal knowledge, and, therefore, the Court shall sustain Defendant's objection to it.

In paragraph 14, Lohn states that, under Sigal's management, the "Power Ranking System" was in place to distribute accounts but that it was not followed consistently, if at all. Lohn then states that when Robinson left in 2003, her entire book of business was given to Tom Chrieton without regard to the system.  These statements are not based on Lohn's personal knowledge, and, as such, the Court shall sustain Defendant's objection to them.  However, the remainder of paragraph 14 is within her personal knowledge as it states that, between 2002 and 2005, she did not receive accounts when ten of the brokers left nor did she receive any accounts from the trainees who left.  This information is well within the bounds of Lohn's personal knowledge because she would be aware of whether she received accounts from these ten individuals or the trainees.  As such, Defendant's objection to these statements is overruled.

Defendant objects to paragraphs 18 through 23 because they describe conduct that allegedly occurred before the limitations period and, as such, are irrelevant and lack probative value.  Lohn, however, contends that evidence of discriminatory acts that fall outside of the limitations period are relevant and may be used as background evidence.  The Court agrees with Lohn.  "A hostile work environment claim necessarily involves 'the cumulative [e]ffect of individual acts,' and evidence presented in support of these claims may fall outside of the statutory period."  *Abner v. Kan. City S. R.R. Co.*, 513 F.3d 154, 166 (5th Cir. 2008) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002)).  Paragraphs 18 through 23 describe comments and conduct that support Lohn's hostile work environment claim despite the fact that these comments and conduct may date back to the early 1990s.  Accordingly, the Court overrules this objection.

Paragraph 28 states that "[o]n or about May 9, 2005, a sexually explicit cartoon was left in my inbox . . . [t]his was one of many over the years.  Indeed, I consistently received

sexually inappropriate messages either in my inbox or through email." Plaintiff testified at her deposition that she received this cartoon at the end of 2004 or in 2005, and the date on the cartoon, which is attached as exhibit 3 to Plaintiff's affidavit, is May 9, 2005. The fact that Lohn could not remember the exact date on which she received this cartoon when she testified at her deposition does not render this statement inadmissible. Furthermore, the Court will allow Plaintiff's statement that she consistently received sexually inappropriate messages in her inbox and via email. Although there is a discrepancy between this statement and Lohn's deposition testimony with respect to her inbox, Lohn contends that she made an error during her deposition. Additionally, the fact that no other copies of messages, whether paper copies or emails, have been provided as exhibits does not go to the admissibility of paragraph 28 but rather to its weight. As such, Defendant's objection to paragraph 28 is overruled.

Defendant objects to the statement in paragraph 30 that Lohn was labeled as a complainer and a bitch because she complained about the account distributions and inappropriate behavior. This part of paragraph 30 is based on hearsay information, not on Lohn's own personal knowledge. (*Id.* at 128-30). As such, it must be stricken from the record.

2.    Objections to Exhibits to Plaintiff's Response

Defendant objects to exhibit D, which is an Examination Under Oath (EUO) of Austin, a former Financial Advisor at Morgan Stanley. Defendant argues that, because much of Austin's statement is based on hearsay and not personal knowledge and because Defendant was not given an opportunity to test the competency of Austin's testimony, the entire exhibit should be stricken from the record. Alternatively, Defendant requests that the statements on page 36 from lines 3-11 and those on page 41 from lines 4-9 be stricken because they are inadmissible hearsay, are not relevant, and have no probative value. Plaintiff disagrees. The Court has

reviewed the EUO of Austin, which is a sworn statement under oath.  This statement was taken in conjunction with an EEOC investigation involving Lohn, Austin, and Leigh-Ann McWherter. It is both relevant and probative of the environment in which these women worked.  This statement is not rendered inadmissible for purposes of summary judgment merely because Defendant was unable to cross-examine Austin at the time the statement was taken.  With respect to the statement on page 36, the Court finds that this is relevant to and probative on the issues presented in the instant case.  With respect to the statement on page 41, this is a statement of Austin's personal opinion on whether she would have the same experience at Morgan Stanley as a male.  As such, the Court overrules Defendant's objections to exhibit D.

Defendant objects to exhibit M, a spreadsheet of RIF selections.  Defendant contends that this exhibit is not a true and accurate copy of the document Bates numbered MSLOHN 110 which was produced during discovery but, rather, that it is a manipulated version. Defendant further argues that this exhibit is unauthenticated and constitutes inadmissible hearsay and, as such, should be stricken from the summary judgment record.  In response, Plaintiff contends that MSLOHN 110 in its original form on compact disc contained over 10,000 names and is 100 pages long.  (Greer Aff., Doc. 75 Ex. U at ¶ 3).  As such, Plaintiff resorted the data by area, eligibility for selection in the RIF, and branch.  (*Id.*).  Plaintiff did not alter the data in any way.  (*Id.* at ¶ 5).  Any defect in exhibit M has been cured by exhibit U to Plaintiff's surreply. Exhibit U contains the affidavit of Lisa Greer, a legal assistant for Plaintiff's counsel, as well as a complete copy of MSLOHN 110, cover letters from Defendant's counsel that were sent with responses to discovery requests, and copies of the compact discs that were provided by Defendant's counsel.  Therefore, Defendant's objection to exhibit M is overruled.

Exhibits N through Q are pleadings and documents, including a settlement papers, from a class action gender discrimination case against Defendant. Plaintiff opted out of this class action suit in favor of filing her own individual lawsuit. Defendant objects to exhibits N through Q because on the grounds that they are irrelevant and that the probative value of any information in them would be outweighed by the undue prejudice that would result. Plaintiff contends that the information about the class action undermines Defendant's portrayal of Lohn and her case, as well as Defendant's argument that Lohn has only hearsay and speculation to support her claims. While these exhibits may provide a context for Lohn's claims and may be relevant to the issues presented in her case, the Court finds that they must be stricken from the record. Exhibit P, the settlement agreement itself, specifically states as follows:

> Nothing in this Settlement Agreement, nor any action taken in implementation thereof . . . is intended by the parties to, nor shall any of the foregoing constitute, be introduced, be used or be admissible in any way in this case or any other judicial, arbitral, administrative, investigative or other proceeding of whatsoever kind or nature . . . as evidence of discrimination, retaliation or sexual harassment or as evidence of any violation of Title VII, parallel state and local laws prohibiting sex discrimination, the common law of any jurisdiction, or any other federal, state or local law, statute, ordinance, regulation, rule or executive order[.]

(Doc. 29 Ex. P at 18). Because of this language and the fact that the probative value of exhibits N through Q would be outweighed by the undue prejudice that would result from their admission, the Court shall sustain Defendant's objection.

B.      Objections to Magistrate Judge Frances Stacy's June 17, 2009, Order

Plaintiff Lohn objects to the portion of the magistrate judge's order that denies her access to the account distribution information and compensation figures for individual brokers by

calendar year at the Houston-Greenway Plaza Branch from 1993 to 2005.[3]  Plaintiff contends

that the Lilly Ledbetter Fair Pay Act of 2009 (the LLFPA), Pub. L. No. 111-2, 123 Stat. 5

(2009), creates a new entitlement to additional data from earlier years.  Defendant disagrees and

maintains that it has produced the requested information for the relevant limitations period under

the TCHRA.  For the reasons set forth below, the Court will sustain-in-part and overrule-in-part

Plaintiff's objection to the magistrate judge's ruling.

Pursuant to Fed. R. Civ. P. 72(a), the District Judge may consider any objections

filed by a party on a non-dispositive matter referred to the Magistrate Judge and either modify or

set aside the Magistrate Judge's order if it is "clearly erroneous" or "contrary to law."  *United

States v. Kennedy*, Civil Action No. H-07-3437, 2008 WL 4200780, at *1 (S.D. Tex. Sept. 9,

2008) (citing 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); *Ford v. Estelle*, 740 F.2d 374, 377

(5th Cir. 1984); *United Steelworkers of Am., AFL-CIO v. N.J. Zinc Co., Inc.*, 828 F.2d 1001,

1006 (3d Cir. 1987); *Brown v. Wesley's Quaker Maid Inc.*, 771 F.2d 952 (6th Cir. 1985)).

As the Court later explains in this Opinion and Order, the LLFPA applies to

claims brought under the TCHRA.  As such, Lohn's claims arising out of compensation received

within two years of the date on which she filed her charge of discrimination are timely and may

be pursued.  This determination does not preclude Lohn from requesting discovery outside of

this time period.  As it states in the LLFPA, "nothing in this Act is intended to preclude or limit

an aggrieved person's right to introduce evidence of an unlawful employment practice that has

occurred outside the time for filing a charge of discrimination."  Pub. L. No. 111-2, § 2(3), 123

Stat. 5, 5-6.  *See also Morgan*, 536 U.S. at 113 (finding that title VII does not bar an employee

from using prior acts as background evidence in support of a timely claim).  In light of this legal

---

[3] As both parties acknowledge, Plaintiff's original request for production sought information from 1996 to 2005.  However, Plaintiff now contends that it is more accurate if the time frame ranged from 1993 to 2005 because those are her actual dates of employment.

authority and the Court's decision to apply the LLFPA to Plaintiff's TCHRA claims, the Court shall modify the magistrate judge's order.

As Defendant argues, Plaintiff's original requests for production did not seek the information she now requests.  Rather, Requests for Production Nos. 8 and 9 asked for copies of any criterion and formulas used to distribute accounts among brokers when another broker left Defendant's office from 1996 to 2005.  (Doc. 60 Ex. 4).  As such, Defendant shall provide the information requested in Requests for Production Nos. 8 and 9 from 1996 to 2005.  This information goes to the heart of the issue on Plaintiff's discriminatory distribution claim.

IV.        Discussion

        A.        Gender Discrimination Claims Brought Pursuant to the TCHRA

                1.        Discriminatory Distribution of Client Accounts

                        a.        Timeliness

Defendant argues that Lohn's claim that she suffered gender discrimination with respect to account distributions is time-barred because these allegedly discriminatory distributions occurred more than 180 days before Lohn filed her charge of discrimination.  Lohn, however, contends that her claim falls within the scope of the LLFPA.  Defendant asserts that the LLFPA, which explicitly amended Title VII of the Civil Rights Act, did not automatically amend the TCHRA and that, until the Texas legislature passes an analogous statute, it would be legally erroneous to apply the LLFPA to the TCHRA.  The Court, however, disagrees and finds that the LLFPA applies to the facts of this case.

The TCHRA sets forth a comprehensive administrative review system for employees to obtain relief from unlawful employment practices.  *Martin*, 65 F. Supp. 2d at 530 (citing *Schroeder*, 813 S.W.2d at 485; *Eckerdt v. Frostex Foods, Inc.*, 802 S.W.2d 70, 71 (Tex.

App.—Austin 1990, no writ)).   Before an employee files suit, she must first exhaust her administrative remedies under the TCHRA.  *Id.* (citing *Caballero v. Cent. Power & Light Co.*, 858 S.W.2d 359, 360 (Tex. 1993); *Schroeder*, 813 S.W.2d at 486).   An employee claiming to be aggrieved by an unlawful employment practice must file a complaint with the Texas Commission on Human Rights (TCHR) within 180 days of the alleged discriminatory act.  *Id.* (citing TEX. LAB. CODE ANN. § 21.202(a) ("A complaint under this subchapter must be filed not later than the 180th day after the date the alleged unlawful employment practice occurred"). State law claims of employment discrimination are time-barred when filed after the 180-day period.  *Id.* at 531 (citing *Pope v. MCI Telecomm. Corp.*, 937 F.2d 258, 263-64 (5th Cir. 1991), *cert. denied*, 504 U.S. 916 (1992)).

The LLFPA amended title VII "to clarify that a discriminatory compensation decision or other practice that is unlawful . . . occurs each time compensation is paid pursuant to the discriminatory compensation decision or other practice[.]"  Pub. L. No. 111-2.  Specifically, it added the following to 42 U.S.C. § 2000e-5(e):

> [A]n unlawful employment practice occurs, with respect to discrimination in compensation in violation of this title, when a discriminatory compensation decision or other practice is adopted, when an individual becomes subject to a discriminatory compensation decision or other practice, or when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice.

Pub. L. No. 111-2, § 3, 123 Stat. 5, 5-6.  Under the LLFPA, the deadline by which Lohn must file a charge of compensation discrimination with the TCHR is 180 days from the date she last received a paycheck from Defendant.

Defendant argues that the LLFPA does not apply to the TCHRA, and Plaintiff disagrees.  At the time the parties filed their briefs, this issue had not yet been addressed by either a state court or federal district court in Texas.  However, since that time, Magistrate Judge Andrew W. Austin (Judge Austin) issued his ruling in *Klebe v. Univ. of Texas Sys.*, No. A-08-CA-091 AWA, 2009 WL 2406204 (W.D. Tex. Aug. 3, 2009).  As Judge Austin states,

> the job of the Court is to interpret the statute as written.  And to this point, the Legislature has spoken by saying the purpose of the Act is to work in parallel with Title VII and its amendments.  TEX. LAB. CODE § 21.001(1).  Given this, and given that the Ledbetter Act unequivocally states Congress' intention with regard to when a compensation-based discrimination claim accrues under Title VII, a Texas court faced with this issue would plainly do what the federal courts that have faced the issue have done-apply the Ledbetter Act . . . [i]ndeed, the process followed by the Third Court of Appeals in resolving this very issue in this case was to look to federal law.  Given that the Ledbetter Act revised the federal case law previously relied upon, this is additional evidence that the Ledbetter Act would be looked to by Texas courts as authoritative on this question.

*Id.* at * 3 (internal citations omitted).  *See also Gentry v. Jackson State Univ.*, 610 F. Supp. 2d 564, 566-67 (S.D. Miss. 2009); *Bush v. Orange County Corr. Dept.*, 597 F. Supp. 2d 1293, 1295 (M.D. Fla. 2009).  The Court agrees with Judge Austin's reasoning on this issue and, in the interest of consistent rulings, shall apply it to the instant case.  As such, Lohn's claims arising out of compensation received within two years of the date on which she filed her charge of discrimination are timely and may be pursued.  *See id.* at * 4 (citing TEX. LAB. CODE § 21.258(c) ("Liability under a back pay award may not accrue for a date more than two years before the date a complaint is filed with the commission.").

b.      Merits of the Claim

Defendant Morgan Stanley argues that Lohn did not seek administrative relief for a disparate impact claim and that, therefore, she cannot assert it in a related civil lawsuit.

Specifically, Defendant asserts that Plaintiff's Charge of Discrimination (the Charge) alleges that she was the victim of intentional discrimination with respect to the distribution of accounts, not that Defendant employed a facially neutral policy that disproportionately affected female employees. The Charge states, in relevant part,

> . . . I was subjected to a discriminatory environment that favored male employees. For example, I was referred to as the "TFB" which meant "token female broker." This "good old boy" network was used to keep females from succeeding at higher levels. Males were given better accounts and were eligible to receive accounts when a broker left or was fired. The method of assigning such accounts was applied in a discriminatory fashion because males received a higher proportion of such accounts.

(Doc. 52 Ex. 5 at 2). The Court disagrees with Defendant's assessment of the Charge. It is unclear from the language of the Charge whether Plaintiff is seeking administrative relief for a disparate impact or disparate treatment claim. As such, the Court declines to dismiss this claim on the grounds of failure to exhaust administrative remedies.

The Court has reviewed the entire record in this cause and is unable to ascertain whether Plaintiff wishes to pursue a disparate treatment or a disparate impact claim with respect to the discriminatory distribution of accounts. Additionally, Defendant has failed to address the merits of whether there were discriminatory distributions in its motion and reply. Furthermore, the Court finds that Plaintiff has raised a genuine issue of material fact with respect to whether Defendant made discriminatory distributions. Thus, the Court shall deny summary judgment on this claim.

## 2. Hostile Work Environment

Defendant argues that Lohn's allegations do not rise to the level of actionable sexual harassment. Although the alleged activities at Defendant's branch may have been crude and inappropriate, Defendant contends that they were not severe or pervasive enough to be

actionable.  Plaintiff, however, argues that the facts that she alleges clearly paint a picture of pervasive harassment occurring over her entire tenure at Morgan Stanley.  As set forth below, the Court finds that there is an issue of material fact with respect to whether the alleged harassment was sufficiently pervasive to affect a "term, condition or privilege" of Lohn's employment.

A plaintiff must demonstrate the following to establish an actionable claim of sexual harassment in the workplace: (1) she belongs to a protected class; (2) she was subject to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a "term, condition or privilege of employment"; and (5) the employer either knew or should have known of the harassment and failed to take prompt remedial action.  *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 593 (5th Cir. 1995) (citing *Jones v. Flagship International*, 793 F.2d 714, 719-20 (5th Cir. 1986), *cert. denied*, 479 U.S. 1065 (1987)).

The Supreme Court has held that, in order to be actionable under the statute, "a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993)).  The criteria for a hostile work environment are as follows: "(1) [s]exually discriminatory intimidation, ridicule and insults, which are (2) sufficiently severe or pervasive that they (3) alter the conditions of employment and (4) create an abusive working environment."  *DeAngelis*, 51 F.3d at 594 (citing *Harris*, 510 U.S. at 21).

"In determining whether an environment is 'hostile' or 'abusive' within the meaning of Title VII, courts look at the totality of the circumstances."  *Harvill v. Westward Communications, LLC*, 433 F.3d 428, 434 (5th Cir. 2005).  In doing so, courts may consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harvill*, 433 F.3d at 434 (quoting *Harris*, 510 U.S. at 23). The effect on the employee's psychological well-being is relevant in determining whether the employee found the environment abusive. *Harris*, 510 U.S. at 23. "But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required." *Id.*

Although, "sexually discriminatory verbal intimidation, ridicule and insults may be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment that violates Title VII," *DeAngelis*, 51 F.3d at 593 (citing *Harris*, 510 U.S. at 22; *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 65 (1986)), "'simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory charges' that can survive summary judgment." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 348 (5th Cir. 2007) (quoting *Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 328 (5th Cir. 2004).

The Fifth Circuit found that the defendant's conduct in *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871 (5th Cir. 1999), did not support a sexual harassment and hostile work environment claim, as the conduct was not severe or pervasive enough to affect a term, privilege, or condition of the plaintiff's employment. In that case, there were incidents of unwanted touching of the plaintiff's arm, attempts to look down the plaintiff's clothing, and remarks of an offensive nature, for example, "your elbows are the same color as your nipples" and "you have big thighs." *Id.* at 872. The Fifth Circuit found that the defendant's remarks and conduct did not render the plaintiff's work environment objectively hostile or abusive even though the incidents occurred intermittently for over a year.

Earlier in this Opinion and Order, the Court outlined several statements and instances of conduct that form the basis of Lohn's hostile work environment claim.  The Court finds that there are genuine issues of material fact with respect to whether the alleged conduct was sufficiently pervasive to be actionable and if there was a two-year period of respite under Benson's management.  In *Mire v. Texas Plumbing Supply Co.*, 286 Fed. Appx. 138 (5th Cir. 2008), the Fifth Circuit found that, in viewing the facts in the light most favorable to the plaintiff, "she painted a picture of a workplace permeated with inappropriate sexual comments and unwanted touching" and that "given the frequency of the harassment alleged . . . occurring for more than two months, combined with the number of coworkers allegedly participating," she presented sufficient evidence of pervasive harassment to survive summary judgment.  *Id.* at 142-43.  The conduct Lohn allegedly endured lasted for far more than two months.  Her coworkers' and managers inappropriate ridicule and insults of a sexual and discriminatory nature were constant enough that a jury could reasonably find that such they affected the conditions of Lohn's employment.

### 3.    Discriminatory Termination

Defendant argues that, although Lohn was within a protected group and was adversely affected by the employer's decision, she cannot establish a *prima facie* case because she cannot show that she was qualified for the position she lost nor can she identify similarly situated persons who, under "nearly identical circumstances" were treated more favorably than she.  Moreover, even if Lohn did establish a *prima facie* case, Defendant asserts that it has articulated a legitimate, non-discriminatory reason for Lohn's termination, that is, she fit into one of the objective categories for the August 2005 Reduction-in-Force.  Lohn maintains that she has demonstrated a *prima facie* case of discrimination in her termination and that Defendant's reason

for her termination is a pretext.  Assuming, *arguendo*, that Lohn has established each element of a *prima facie* case of discrimination, the Court finds that Defendant has articulated a legitimate, non-discriminatory reason for her termination.

In order to establish a *prima facie* case of discrimination in a reduction-in-force case, the plaintiff must show the following: "(1) she was within a protected group; (2) she was adversely affected by the employer's decision; (3) she was qualified to assume another position; and (4) evidence, circumstantial or direct, from which a factfinder might reasonably conclude that the employer intended to discriminate on the basis of her protected status in reaching the decision at issue." *Thomas v. Exxon, U.S.A.*, 943 F. Supp. 751, 759 (S.D. Tex. 1996) (*Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996)).  "To establish a *prima facie* case, a plaintiff need only make a very minimal showing." *Nichols*, 81 F.3d at 41 (quoting *Thornbrough v. Columbus & Greenville R.R. Co.*, 760 F.2d 633, 639 (5th Cir. 1985)).

If the plaintiff establishes a *prima facie* case of discrimination, a presumption of discrimination arises, and the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its employment action.  *See Price v. Federal Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). The defendant's burden is satisfied if it produces evidence that "*taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action." *Id.* at 720 (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993)) (emphasis in original).

If the defendant articulates a reason that can support a finding that its actions were nondiscriminatory, "the mandatory inference of discrimination created by the plaintiff's prima facie case drops out." *Id.* (citing *Hicks*, 509 U.S. at 510-511).  The plaintiff must then introduce evidence creating a jury question as to whether the defendant was motivated by discriminatory

animus.  The plaintiff meets this burden by showing either that (1) defendant's articulated reason was pretextual (pretext alternative), or (2) plaintiff's protected characteristic was a motivating factor in the decision (mixed motives alternative).  *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004) (citing *Rishel v. Nationwide Mut. Ins. Co.*, 297 F. Supp. 2d 854, 865 (M.D.N.C. 2003)).

Although the intermediate evidentiary burdens shift back and forth, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143 (2000) (quoting *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).  In determining whether summary judgment is appropriate, the court considers the strength of the plaintiff's *prima facie* case, the probative value of proof that the employer's explanation is false, and any other evidence that supports the employer's case and that may properly be considered for summary judgment.  *Id.* at 148-49.

Assuming, *arguendo*, that Lohn met her burden and established a *prima facie* case of discriminatory termination, the Court finds that Defendant has articulated a legitimate, non-discriminatory reason for its employment action, the August 2005 Reduction-in-Force.  Because Defendant has met its burden, Lohn must introduce evidence creating a jury question on whether Defendant was motivated by discriminatory animus.  The evidence provided by Defendant on the Reduction-in-Force, including Sanchez's memorandum with the criteria and Henley's affidavit, establish that the August 2005 Reduction-in-Force criteria were applied uniformly among the male and female employees at Morgan Stanley.  The Court is not persuaded by Plaintiff's conclusory arguments about whether Hall was on medical leave and if Wolford's job code was correct as they are not substantiated by any evidence.  Additionally, Plaintiff's arguments about

the implementation of the Reduction-in-Force in other branches is irrelevant to this claim.  Her circumstances are not "nearly identical" to those individuals because they were supervised by their own Branch Managers in the Houston Galleria, Corpus Christi, and Sugarland offices. Thus, the Court shall grant summary judgment on Plaintiff's discriminatory termination claim.

B. <u>Retaliation Claim Brought Pursuant to the TCHRA</u>

Defendant contends that Plaintiff has failed to show a causal link between any alleged protected activity and her selection for the August 2005 reduction-in-force.  Plaintiff has not opposed this argument in her response or surreply.  The Court agrees with Defendant.

To establish a *prima facie* case of retaliation, the plaintiff must establish that: (1) she participated in an activity protected by Title VII; (2) her employer took an adverse employment action against her; and (3) there is a causal connection between the protected activity and the adverse employment action.  *McCoy v. City of Shreveport*, 492 F.3d 551, 556-57 (5th Cir. 2007) (citing *Banks v. E. Baton Rouge Parish Sch. Bd.*, 320 F.3d 570 (5th Cir. 2003)). "Under Title VII, an employee has engaged in protected activity if she has 'opposed any practice made an unlawful employment practice under [42 U.S.C. § 2000e-3(a)].'" *Turner*, 476 F.3d at 348 (quoting 42 U.S.C. § 2000e-3(a)).  To satisfy this opposition requirement, the plaintiff only needs to show that she had a "reasonable belief that the employer was engaged in unlawful employment practices." *Id.* at 348 (quoting *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 428 (5th Cir. 2000)).  Additionally, the Fifth Circuit has held that "[t]he proper standard of proof on the causation element of a Title VII retaliation claim is that the adverse employment action taken against the plaintiff would not have occurred 'but for' her protected conduct." *Septimus v. Univ. of Houston*, 399 F.3d 601, 608 (5th Cir. 2005) (citing *Pineda v. United Parcel Service, Inc.*, 360 F.3d 483, 487 (5th Cir. 2004)).

If Plaintiff makes a *prima facie* showing of retaliation, "the burden then shifts to the employer to articulate a legitimate, nondiscriminatory or nonretaliatory reason for its employment action." *McCoy*, 492 F.3d at 557 (citing *Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002)). If the employer meets its burden, the burden then shifts back to Plaintiff who must prove that the employer's proffered reason is a pretext for the real retaliatory purpose. *Id.* To carry this burden, Plaintiff must rebut each nonretaliatory reason articulated by the employer. *Id.* (citing *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003)).

The Court finds that Plaintiff has failed to meet her burden and establish a *prima facie* case of retaliation. As such, the Court shall grant summary judgment on this claim.

IV.     Conclusion

Accordingly, the Court hereby

ORDERS that Defendant Morgan Stanley's motion for summary judgment (Doc. 52) is GRANTED-IN-PART and DENIED-IN-PART. The Court further

ORDERS that Plaintiff Lohn's discriminatory termination and retaliation claims are DISMISSED with prejudice. The Court further

ORDERS that Plaintiff Lohn's discriminatory account distribution[4] and hostile work environment claims shall remain.

SIGNED at Houston, Texas, this 26th day of August, 2009.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE

---

[4] *See* page 23 of the Court's Opinion and Order. It is unclear from the pleadings and motion papers filed in this case whether Plaintiff Lohn wishes to pursue a disparate impact or disparate treatment claim with respect to the allegedly discriminatory account distributions.